# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
### WESTERN DIVISION

| | | |
|---|---|---|
| In re Robert A. Plichta and Donna M. Plichta, | ) ) ) | |
| Debtors. | ) ) ) ) ) ) | **Bankruptcy No. 17-82147**<br><br>**Chapter 7**<br><br>**Judge Lynch** |

## MEMORANDUM OPINION

Consumers Credit Union ("Credit Union") seeks to dismiss the Debtors' joint Chapter 7 case for abuse under 11 U.S.C. § 707(b).[1] (ECF No. 18.)  The Credit Union first argues that the Debtors did not satisfy the means test prescribed by Section 707(b)(2), contending that they may not treat Credit Union's judgment debt as a secured debt and challenging certain deductions made in their calculations.  It further argues that the totality of the circumstances reveals the Debtors' financial situation to be well above the median income of those similarly situated, amounting to abuse under Section 707(b)(3).  For the reasons discussed below, the court finds that neither the means test nor the totality of the circumstances gives rise to a presumption of abuse in this case.  Accordingly, the Motion will be denied.

## JURISDICTION AND PROCEDURE

The court has jurisdiction to decide this matter pursuant to 28 U.S.C. § 1334 and Internal Operating Procedure 15(a) of the United States District Court for the

---

[1] Motion of Consumers Credit Union to Dismiss Pursuant to 11 U.S.C.  §§ 707(b)(1), (2) and (3) (hereinafter, "the Motion").  (ECF No. 18.)

Northern District of Illinois.  The adjudication of a motion to dismiss a Chapter 7 case

under Section 707(b) is a core proceeding under 28 U.S.C. § 157(b)(2)(O) which this

court may hear and determine.  *In re Smith*, 2016 WL 7441605 (Bankr. N.D. Ill. Dec.

27, 2016). The parties expressly consented on the record to the court's authority to

enter a final determination of this matter. (Tr. Mar. 19, 2018.)

## PROCEDURAL BACKGROUND AND FINDINGS OF FACT[2]

Robert A. Plichta and Donna M. Plichta commenced this Chapter 7 case on

September 23, 2017. This is their third bankruptcy; the couple's last case, filed under

Chapter 7 in late 2009, was dismissed on October 4, 2010.[3] Following the meeting of

creditors held on November 11, 2017, the Chapter 7 Trustee reported his

determination as to the existence of assets or likelihood assets may reasonably be

recovered for administration. (ECF. No. 15.)  The Trustee and the Debtors later

reached a settlement whereby the estate would not pursue the Debtors for the alleged

non-exempt value of certain household goods, furnishings and personal property in

return for which the Plichtas would turn over $23,028 representing the proceeds from

the sale of stock for which the Debtors claimed an exemption.  This court approved

the proposed compromise and on June 1, 2018, the Trustee filed his final account and

---

[2] The following sets forth this court's findings of fact as required by Fed. R. Bankr. P. 7052.  To the extent any findings of fact constitute conclusions of law, they are adopted as such, and to the extent that any conclusions of law constitute findings of fact, they are adopted as such.

[3] Case no. 09-B-75229 (Bankr. N.D. Ill.) That case was dismissed on October 24, 2010 after the court granted the Section 707(b) motion brought by the United States Trustee.  The Plichtas received a discharge on January 11, 1994 in their initial bankruptcy (case no. 93-B-16192).

certification that the estate has been fully administered. [4] (ECF No. 70.)

Credit Union filed the Motion on November 22, 2017, less than three weeks after the initial meeting of creditors. *See* Fed. R. Bankr. P. 1017(e)(1). The court held a one-day trial on the Motion at which only Debtor Donna Plichta was called to testify. Copies of the Debtors' petition and schedules filed in this case and a group exhibit consisting of photographs of the Plichtas' residence were the only exhibits offered at trial. The parties also filed a joint statement of stipulated facts on April 25, 2018. (ECF No. 58.) The court also takes judicial notice of the court's docket in the case and filings therein. *See, e.g., Lulay Law Offices v. Rafter*, 2017 WL 4340089 n.1 (N.D. Ill. Sept. 29, 2017) (taking "judicial notice of matters of public record, such as filings in the bankruptcy court, even where not specifically referenced by the parties") (citing *United States v. Wood*, 925 F.2d 1580, 1582 (7th Cir. 1991)).

**Stipulations and Uncontested Facts.** There is no dispute regarding most of the relevant facts. The Plichtas reside in Barrington Hills, Illinois, at 750 Plum Tree Road. The individual Debtors acknowledge "that their obligations are primarily consumer debts." 11 U.S.C. § 707(b)(1). Credit Union holds the Debtors' Note in the amount of $210,000, dated January 18, 2008, which is secured by their mortgage on the Barrington Hills property. The Note provides that the Debtors will repay Credit Union in monthly installments of $490.37, beginning January 2009. However, in

---

[4] The Plichtas scheduled certain assets which exceeded the amount of their claimed exemptions, including the proceeds of a stock sale. On February 21, 2018, the court approved a proposed compromise between the Debtors and the case trustee, whereby the Debtors agreed to pay over to the estate $23,028 in compromise of all claims of the estate against them. (Order, ECF No. 38.) At the March 19, 2018 hearing, the Trustee represented to the court that he had received these funds from the Debtors.

March 2013 the Debtors defaulted on the note. They never cured the default and have not made a payment on the Note since then. On November 10, 2016, the Circuit Court for the 22nd Judicial Circuit (McHenry County, Illinois) granted the Credit Union summary judgment on the note, awarding it $240,893.02, plus costs.

The Debtors are represented by counsel in this bankruptcy case. It is not disputed that the Plichtas caused the requisite certificates, statements, forms and schedules to be filed with their Chapter 7 petition on September 13, 2017. With these documents the Debtors filed their declaration, signed by both under penalty of perjury, that affirms that they had reviewed their schedules and "that they are true and correct."

The Debtors' bankruptcy schedules disclose total debt secured by property of $1,589,989 and total non-priority unsecured indebtedness of $29,719. Their Schedule D further indicates that based on the value of collateral the unsecured portion of their otherwise secured debt is $989,989. The Debtors' residence is collateral for the secured debt. Shellpoint Mortgage Servicing holds the first mortgage on the property for $1,349,096. The Credit Union holds the second mortgage for $240,893. The parties do not dispute the Debtors' valuation of $600,000 for the Barrington Hills residence[5] nor the lack of equity in the property. In their filings the Debtors stated their intention to keep the Barrington Hills property. They intend to stay current on their mortgage payments to the senior secured lender, but do not intend on making further installment payments on the note held by the Credit Union. (Form 108

---

[5] No evidence has been presented in this case that the value might be greater.

Statement of Intention, ECF No. 1.)[6]

The Debtors' Form 122A-1 Statement of Current Monthly Income lists their total monthly income to be $10,416.00. Mr. Plichta's gross wages, salary, tips, bonuses, overtime, and commissions is identified to be the primary source of their income. (ECF No. 7.) It discloses that their household consists of three people and that their annual income, $124,992.00, exceeds the median family income for a family of three in Illinois ($76,406.00). (*Id.*) The accompanying Form 122A-2 Means Test Calculation claims deductions based on IRS standards of $1,378.00 for food, clothing and other items, $147.00 for out-of-pocket health care allowances, $572.00 for housing / utilities / insurance / operating expenses and $682.00 for vehicle operation expenses. (ECF No. 8.) Their Statement also lists mortgage or rent expense of $1,906.00 which they did not factor into the means test analysis which claimed instead estimated average monthly payments which they calculated for the secured indebtedness to Shellpoint Mortgage Servicing ($3,472.00) and Consumers Credit Union ($4,015.00). (*Id.*) They also claimed deductions of $2,600.00 for taxes, $1,153.00 for additional health care expenses, $90.00 for optional telephone services, $312.00 for health insurance and $30.00 for charitable contributions. From these figures the Debtors derived their monthly disposable income to be negative $4,035.00 for purposes of the means test, which figure is based on $10,416.00 current monthly income and $14,451.00 in total deductions. (*Id.*) The Debtors now admit that this calculation is incorrect because they erroneously used the IRS Local Standards for Lake County,

---

[6] Specifically, they state their intent with respect to Shellpoint as "Retain – Keep Current" and their intent with respect to Credit Union as "No Equity Available to Creditor." (*Id.*)

Illinois, rather than McHenry County. (Stipulation, ECF No. 58.)

The Debtors' Schedule I lists Mr. Plichta's monthly income to be $10,416.00 subject to payroll deductions totaling $3,562.00. Adding to this Ms. Plichta's Social Security income of $1,034, the schedule estimates their total monthly income to be $7,888.00. Their Schedule J estimates total monthly household expenses of $9,152.44, which amount includes $3,472.44 for home ownership expenses, $200.00 for home maintenance, repair and upkeep, $800 for utilities and $600 attributed to their service dogs.

Ms. Plichta testified at trial. Her testimony began with a review of Schedules I and J which confirmed her spouse's income. She testified that she does not know how much they have in retirement savings. Turning to schedule J, she testified that their 32-year-old daughter "lost her job" and has lived with her parents since shortly before this case commenced, around August 30 – September 1, 2017. The witness explained that her daughter suffers from a worsening debilitating medical condition, "very serious health issues" as Ms. Plichta put it. Remaining unemployed, the daughter does not "contribute anything" to support the household and depends on her parents for her support. Ms. Plichta further testified that due to her own medical condition she has two certified service dogs as prescribed by her doctor. Her testimony that that the $600 expense for the service animals in the schedules accurately reflects their expense was not controverted. She further testified that both animals have assisted her for more than ten years.

Ms. Plichta then proceeded to summarize the Debtors' financial circumstances.

She and her husband purchased their residence in 2003, describing the purchase as the couple's last major voluntary expense or luxury item. She testified that since then they have spent approximately $60,000 on needed modifications and improvements to the house. Ms. Plichta further testified that she suffers from an autoimmune disorder and that over the years her condition has necessitated the customization of their house, including the installation of a "specified humidification system" to assist her breathing. She described the couple's car as "old" and testified that they took their last vacation more than fifteen years ago. Ms. Plichta testified that the last major household items they purchased were a couch in 2003 and a television in 2004.

Ms. Plichta testified that in June 2017 they discovered mold in their house. She stated that they have spent approximately $40,000 to date for the removal and remediation of the mold. The remediation work continues. Ms. Plichta also testified that a tumor on her spine was discovered in the Spring of 2017 and that in early 2018 her husband was diagnosed with a coronary blockage. She expects the Debtors expenses will increase as a result of these circumstances.

## DISCUSSION

Section 707(b) of the Bankruptcy Code authorizes the dismissal or conversion of Chapter 7 cases brought by individual consumer debtors if the court determines that granting the discharge would constitute "abuse." 11 U.S.C. § 707(b)(1). On motion of any party in interest or on the court's own motion and after notice and hearing, a court "may dismiss a case filed by an individual debtor under [Chapter 7]

whose debts are primarily consumer debts, or, with the debtor's consent, convert such a case to a case under chapter 11 or 13 of this title,[7] if it finds that the granting of relief would be an abuse of the provisions of this chapter." *Id.* The 2005 amendments to the Bankruptcy Code added a "means test" whereby abuse is presumed if, after deducting allowable expenses, the debtor's income is above a monetary threshold deemed sufficient to make a meaningful distribution to pre-petition creditors. 11 U.S.C. § 707(b)(2). *See* Fed. R. Bankr. P. 1007. 6 COLLIER ON BANKRUPTCY ¶ 707.04[3][a] (Richard Levin & Henry J. Sommer eds. 16th ed.). When the presumption under the means test does not arise or is rebutted, the court shall consider whether the petition was filed in bad faith or the totality of the circumstances of the debtor's financial circumstances demonstrate abuse. 11 U.S.C. § 707(b)(3). *See* 6 COLLIER ON BANKRUPTCY ¶ 707.04[4][b].

Section 707(b)(6) limits the standing of parties who may file a motion under Section 707(b) where the debtors' combined current monthly income is less than the applicable median family income. In the present case neither party contends that the Debtors are "below median." This threshold amount, $76,406, is the median income for a family of three in Illinois as of the petition date. Census Bureau Median Family Income By Family Size (Cases Filed Between May 1, 2017 and October 31, 2017, Inclusive),

---

[7] The Debtors' schedules list $1,589,989 in total noncontingent, liquidated claims, all secured by mortgages in the Debtors' residence which the Debtors value to be worth $600,000. They list $29,719 to be the total noncontingent, liquidated, unsecured claims against the Debtors. The Plichtas, therefore, appear to be ineligible for relief under Chapter 13, as they exceed that chapter's $1,184,200 secured debt limit as well as its $394,725 unsecured debt limit (to the extent the secured claims are treated as unsecured due to the value of the underlying collateral and pursuant to Section 506(a)) set forth in Section 109(e)).

https://www.justice.gov/ust/eo/bapcpa/20170501/bci_data/median_income_table.htm (last visited Sept. 4, 2018). No evidence has been presented by either party to suggest the Debtors are "below median." Rather, the Official Form 122A-1 filed by the Debtors on September 13, 2017 lists their total current monthly income to be $10,416 or $124,992 annually, well above the threshold.

## A. Whether the Presumption Arises Under the Means Test.

The Credit Union first argues that the abuse may be presumed here by operation of the means test. Under Section 707(b)(2), abuse shall be presumed if the debtor's "current monthly income" minus allowable expenses times 60 is greater or equal to $12,850 or is greater or equal to the greater of $7,475 or 25% of the debtor's nonpriority unsecured claims.[8] 11 U.S.C. § 707 (b)(2)(A)(i). The Bankruptcy Code provides that current monthly income

> (A) means the average monthly income from all sources that the debtor receives (or in a joint case the debtor and the debtor's spouse receive) without regard to whether such income is taxable income, derived during the 6-month period ending on—
>
>> (i) the last day of the calendar month immediately preceding the date of the commencement of the case if the debtor files the schedule of current income required by section 521(a)(1)(B)(ii); or
>> (ii) the date on which current income is determined by the court for purposes of this title if the debtor does not file the schedule of current income required by section 521(a)(1)(B)(ii); and
>
> (B) includes any amount paid by any entity other than the debtor (or in a joint case the debtor and the debtor's spouse), on a regular basis for the household expenses of the debtor or the debtor's dependents (and in

---

[8] Section 707(b)(7) prohibits a motion under Section 707(b)(2) if the debtor's current monthly income is below the applicable family median, but as noted above, neither party contends the Debtors to be below median.

a joint case the debtor's spouse if not otherwise a dependent), but excludes benefits received under the Social Security Act, payments to victims of war crimes or crimes against humanity on account of their status as victims of such crimes, and payments to victims of international terrorism (as defined in section 2331 of title 18) or domestic terrorism (as defined in section 2331 of title 18) on account of their status as victims of such terrorism.

11 U.S.C. § 101 (10A).

The Debtors scheduled their current monthly income as $10,416, consisting of Mr. Plichta's gross wages, salary and commission as an architect and excluding the $1,034 Ms. Plichta receives each month in Social Security payments.  The Credit Union does not dispute the current monthly income estimated by the Debtors. Instead, it challenges the Debtors' deductions from this income.

Section 707(b)(2)(A)(i) permits debtors to deduct certain specified items from their current monthly income. *See* 11 U.S.C. § 707(b)(2)(A)(ii), (iii) and (iv). Applicable amounts based primarily on Internal Revenue Service standard expenses for the area in which the debtor resides are deducted under Subpart (A)(ii). Subpart (A)(iii) permits deductions for payments on account of secured debts and (A)(iv) permits deductions for payments of priority claims. In their Form 122A-2 Means Test Calculation filed September 13, 2017, the Debtors claim a total of $6,622 in "expenses allowed under IRS expense allowances," $342 in "additional expense deductions" and $7,487 for payments on "debts that are secured by an interest in property that [the Debtors own]." (ECF No. 8.)  Based on these figures, the Debtors calculate that their monthly disposable income for purposes of Section 707(b)(2)'s means test is a negative amount, -$4,035, and therefore argue that the presumption of abuse does not arise in

this case.

The Credit Union disagrees. It objects to the Debtors' deduction for payments on their secured debts, particularly the debt owed the Credit Union, arguing that such payments should be disallowed because the Debtors are not making payments on them and show no sign they will do so in the future. In addition, it points out that the Debtors did not use the standard IRS allowance for McHenry County, Illinois, where they reside, and instead used the allowance for a more expensive county. The Credit Union further asserts that the Debtors used otherwise incorrect amounts that inflated their deductions. It argues that when these amounts are corrected to reflect allowed expenses, the Debtors fail to "pass" the statutory means test.

1. **Debtors Need Not Retain Collateral or Intend to Make Actual Payments to Deduct Contractually Scheduled Payments on Secured Debts for Purposes of Section 707(b)(2)(A)(iii).**

The Debtors valued their residence to be worth $600,000 and the parties stipulate that it is encumbered by a first mortgage of Shellpoint Mortgage Servicing with a balance due of $1,349,096.00 and the second mortgage of Consumers Credit Union with $240,893.00 still outstanding. (Stipulation, ECF No. 58, ¶10.) In their Form 122A-2 Means Test Calculation, the Debtors' list total average monthly payments of $3,472.00 to Shellpoint Mortgage Servicing and $4,015.00 to Consumers Credit Union. Their Schedule J lists $3,472.44 as the amount of their monthly "rental or home ownership expense [including] first mortgage payments." (ECF No. 1.) The Debtors admit that "they have no intention to make [payments to Consumer Credit Union] going forward" and instead intend for the Credit Union to "[e]ssentially ... be treated as another unsecured creditor." (Debtors' Resp., ECF No. 28, ¶19.) There is

no dispute that the monthly installment payment on the mortgage note to Consumer Credit Union was $490.37, and that the Credit Union obtained a judgment in the amount of $240,893.02 after the Debtor's March 2013 default. (ECF No. 28, ¶¶4, 7, 9.)

Pursuant to 11 U.S.C. § 707(b)(2)(A)(iii), Form 122A-2 directs the debtor "to calculate the total average monthly payment" on a secured debt by adding "all amounts that are contractually due to each secured creditor in the 60 months after you file for bankruptcy [t]hen divide by 60." (ECF No. 8.)  The Debtors assert that because the Credit Union judgment was entered prepetition they may treat the entire amount as contractually due and divide that sum, $240,893.02, by 60 months to reach the $4,015 monthly figure entered on the means test form.

For the means test calculation, Section 707(b)(2) permits the reduction of:

> [t]he debtor's average monthly payments on account of secured debts [which] shall be calculated as the sum of—
>
> (I)   the total of all amounts scheduled as contractually due to secured creditors in each month of the 60 months following the date of the filing of the petition; and
> (II)  any additional payments to secured creditors necessary for the debtor, in filing a plan under chapter 13 of this title, to maintain possession of the debtor's primary residence, motor vehicle, or other property necessary for the support of the debtor and the debtor's dependents, that serves as collateral for secured debts;
>
> divided by 60.

11 U.S.C. § 707(b)(2)(A)(iii).

The Credit Union urges us to adopt the view of certain courts that a debtor may not deduct under Section 707(b)(2)(A)(iii) payments on a secured loan where the

debtor has expressed an intent to surrender the collateral. *See, e.g., In re Fredman*, 471 B.R. 540 (Bankr. S.D. Ill., 2012).[9]   These decisions express concern that for purposes of the means test it may be unfair to allow debtors to deduct as "phantom expenses" average monthly payments on secured debts the debtor will never actually make. This court is concerned that this view overlooks the express terms of the statute. The large majority of cases addressing this question have held that the plain language of Section 707(b)(2)(A)(iii) permits deduction of payments on account of secured debts whether the debtor in fact intends to continue making payments on the loan post-petition. *See, e.g., In re Arndt*, 2017 WL 5164141 (Bankr. N.D. Ohio Nov. 6, 2017) (citing more than 70 cases adopting the majority approach). As COLLIER points out "[t]he provision also makes no distinction between payments on property that the debtor intends to retain and property the debtor will surrender; its plain language literally requires that all payments contractually due to secured creditors during the relevant period be deducted." 6 COLLIER ON BANKRUPTCY ¶707.04[3][c][ii] at 707–39.

Interpretation of the Bankruptcy Code starts "with the language of the statute itself." *Ransom v. FIA Card Servs., N.A.*, 562 U.S. 61, 69 (2011) (quoting *U.S. v. Ron Pair Enter., Inc.*, 489 U.S. 235, 241 (1989)). When the "statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms." *Lamie v. U.S. Trustee*, 540 U.S. 526, 534 (2004) (internal citations omitted). Although Section 707(b)(2)(A)(iii) refers

---

[9] Here, the Credit Union has presented no evidence to show the Debtors intend to surrender their home or to cease making payments on the first mortgage to Shellpoint. Payment of that expense therefore does not appear to be at issue. Instead, the Credit Union contends, and the Debtors do not dispute, that they do not intend to make future payments to the Credit Union on the second mortgage.

to "average monthly payments," the statute is clear that the permitted reduction is not based on actual anticipated payments. To the contrary, it states that the amount "shall be calculated" using the formula it provides. This formula is not based on anticipated actual payments, but rather on amounts "scheduled as contractually due." Indeed, where the final payment is due less than 60 months after the petition date or where the contract provides for unequal payments, the formula modifies the amount deductible even from the scheduled amount by re-amortizing all amounts due within that 5-year period across 60 months.

The court in *In re Fredman* found the term "scheduled as contractually due" used in Section 707(b)(2)(A)(iii) to be a "term of art in bankruptcy parlance that refers to a debtor placing information on the bankruptcy schedules." 471 B.R. at 550. From this court reasoned that by stating their intent to surrender their residence in their bankruptcy petition and by failing to list future payments as an expense on their Schedule J or means test form, the debtors had in effect "scheduled" no future payments on the debt. *Id.*[10]

This court respectfully cannot agree with that reasoning. Although Section 521(a)(1)(B)(ii), effectuated through form Schedule J, requires the debtor to file a schedule of "current expenditures," the form does not require information about amounts that will be "contractually due" within the following 60 months. "There is," as Judge Doyle noted in *In re Randle,* "no bankruptcy schedule that requires the debtor to list 'all amounts contractually due to secured creditors in each month of the

---

[10] As noted above, here the Debtors listed payment of their first mortgage to Shellpoint as an expense on Schedule J but listed no payment to the Credit Union on the second mortgage.

60 months following the date of the petition.' So there is no bankruptcy schedule to which § 707(b)(2)(A)(iii) could refer." 358 B.R. 360, 365 (Bankr. N.D. Ill. 2006). Notably, *In re Fredman* acknowledges that no schedule provides for listing debts "contractually due at the time of the petition." Instead, the decision simply suggests that a debtor's intent to make no payments on a debt could be inferred from the debtor's Schedule J, B22A, Schedule D and Statement of Intention. 471 B.R. at 551 (quoting *In re Rudler*, 576 F.3d 37, 47 (1st Cir. 2009).

Where Congress refers to "bankruptcy schedules" elsewhere in the Bankruptcy Code, it "included in the statute a reference to schedules, either directly by name or indirectly by reference to § 521." *Randle v. Neary (In re Randle)*, 2007 WL 2668727, at *6 (N.D. Ill. July 20, 2007) (quoting *In re Nockerts*, 357 B.R. 497, 502 (Bankr. E.D. Wisc. 2006)). When "terms used in a statute are undefined, we give them their ordinary meaning." *Hamilton v. Lanning*, 560 U.S. 505, 513 (2010) (internal citation omitted). Neither the term "scheduled" nor "scheduled as contractually due" are defined in the Bankruptcy Code, and this court, like the court in *In re Randle*, will use the ordinary meaning of those terms and "rejects the alternative position ... that the term 'scheduled as' is a term of art to be interpreted as a reference to bankruptcy schedules." 2007 WL 2668727, at *6. *See also In re Rudler*, 576 F.3d 37, 47 (1st Cir. 2009) (adopting "the common, dictionary-defined meaning of 'scheduled' as 'planned for a certain date'") (quoting *In re Hayes*, 376 B.R. 55, 61 (Bankr. D. Mass. 2007)).

The Credit Union here seems to argue that the term "scheduled as contractually *due in* each month of the 60 months following the date of the filing of

the petition" refers only to amounts which *first* become due during such period. It notes that the original payment schedule on its loan was for monthly payments of only $490.37 and argues that the original contract merged into and was extinguished by the judgment the Credit Union obtained prepetition.

However, this court finds the statute refers more broadly to any amount which became contractually due in or before and remains "due in" any of the months within the 60-month period. This interpretation better accords with the plain meaning of the words of the statute. Where Congress refers narrowly to only amounts which come due within an original payment schedule elsewhere in the Bankruptcy Code, it uses the term "original payment schedule." For example, Section 1322(c)(2) permits modification of a secured claim on a principal residence if "the last payment on the original payment schedule ... is due before the date on which the final payment under the plan is due." 11 U.S.C. § 1322(c)(2). Similarly, where the Bankruptcy Code refers to a payment *becoming* due rather than remaining due, it states as much. For example, in Section 1325(a)(8), the Bankruptcy Code requires for confirmation of a Chapter 13 plan that the debtor have paid all domestic support obligations "that first become payable after the date of the filing of the petition." 11 U.S.C. § 1325(a)(8). Thus, like the court in *Rudler*, this Court sees "no reason to depart from the provision's plain meaning, i.e., that the debtor may deduct all payments owed at the time of the bankruptcy filing." 576 F.3d at 48.

The court in *Fredman* suggests that the rejection of mechanical tests in favor of a more flexible "forward looking" approach to the issue of "projected disposable

income" in Chapter 13 cases in *Hamilton v. Lanning*, 560 U.S. 505 (2010), *Ransom v. FIA Card Servs., N.A.*, 562 U.S. 61 (2011) and *In re Turner*, 574 F.3d 349 (7th Cir. 2009), lead to the conclusion that Section 707(b)(2)(A)(iii) does not permit deduction of payments on secured debts the debtor does not intend to make. 471 B.R. at 551-554. While there is some surface appeal to the argument, closer inspection of the reasoning of those decisions reveals that none of those Chapter 13 cases stand for the proposition that a debtor may not deduct payments on a secured debt in determining the presumption of abuse under the Chapter 7 means test unless the debtor intends to retain and make actual payments on such debts. *See, e.g., In re Johnson*, 503 B.R. 447, 450 (Bankr. N.D. Ind. 2013).

At issue in *Hamilton v. Lanning* was whether the debtor had to include a one-time buyout from her former employer received less than 6 months prior to the bankruptcy petition in calculating the "projected disposable income to be received in the applicable commitment period" which Section 1325(b)(1) required to be committed to her Chapter 13 bankruptcy plan. Section 1325(b)(2) defines "disposable income" as the debtor's "current monthly income received by the debtor" minus certain deductions and allowed expenses set forth in Section 1325(b). A debtor's "current monthly income" is defined using a mechanical and backwards-looking approach based on the "average monthly income from all sources that the debtor receives ... without regard to whether such income is taxable income, derived during the 6-month period ending on ... the last day of the calendar month immediately preceding the" petition date. 11 U.S.C. § 101(10A). Because the buyout was received during that 6-

month period in *Hamilton*, the trustee argued that it needed to be included in calculating the debtor's projected disposable income regardless of whether she would receive any future such payment during the plan period.

The Supreme Court rejected the trustee's argument, but not on the basis of the defined terms "current monthly income" or "disposable income." Instead, the Court focused on the undefined term "projected" in Section 1325(b)(1), noting that while "projection takes past events into account, adjustments are often made based on other factors that may affect the final outcome." 560 U.S. at 513-14. The Court also noted language in Section 1325(b)(1) referring to the projected disposable income "to be received in the applicable commitment period" for the plan, finding that the phrase "strongly favors the forward-looking approach" based on actual anticipated income. 560 U.S. at 517. It pointed out the legislative choice to expressly make the test in Section 1325(b)(1) "as of the effective date of the plan" as opposed to as of the petition date "is more consistent with the view that Congress expected courts to consider post-filing information about the debtor's financial circumstances" in applying the projected disposable income test. 560 U.S. at 518. According to the Court, it would be odd and a "hollow command" to interpret the confirmation standard in Section 1325(b)(1) as requiring "projected disposable income" the debtor is virtually certain never to receive to "be applied to make payments" to creditors. 560 U.S. at 518–19.

The reasoning in *Hamilton v. Lanning*, particularly when considered with the manifest language differences found in Sections 1325(b)(2) and 707(b)(2)(A)(iii), reveals that Section 707(b)(2)(A)(iii) permits deduction on account of secured debts

regardless of whether the debtor intends to continue making payments on such debts in the future.  Unlike Section 1325(b)(1), Section 707(b)(2)(A)(iii) does not use the term "projected."  *Hamilton* contrasted Congress' ordinary use of the term "'projected,' which requires 'mathematic acumen adjusted by deliberation and discretion'" with the use of the term "'multiplied,' which 'requires only mathematical acumen.'"  560 U.S. at 514 (quoting *In re Kibbe*, 361 B.R. 302, 312, n. 9 (1st Cir. BAP 2007)).  While Section 707(b)(2)(a)(iii) does not use the term "multiplied," it uses the mathematical terms "the sum of" and "divided by" in setting forth a rigid mathematical formula. Unlike other sections of Section 707(b), such as subsection (2)(A)(IV) and (V), it refers not to "actual expenses" but rather to "amounts scheduled as contractually due."  It therefore provides for a deduction based on a simple mechanical calculation which requires no prediction.[11]

*Hamilton's* concern that rigid application of the formula would require some debtors to propose a Chapter 13 repayment schedule they could not afford obviously does not readily translate to Chapter 7.  Instead, the means test under Section 707(b)(2) performs a function "at the front end of the bankruptcy process" to draw a bright-line for the presumption of abuse. *In re Arndt*, 2017 WL at *24.  There is no need to search for implied flexibility where it does not appear in the language of the statute, since such flexibility appears elsewhere.  As discussed below, Section

---

[11] Were this not so, a court would face the vexing conundrum as to where the line should be drawn in allowing the deduction of the secured debt. "Would checking the box that the debtor intends to reaffirm be enough ...?  How about tendering a post-petition payment to the secured creditor, even if that payment may be returned?  What about actually signing a reaffirmation agreement, and then rescinding it after the deadline to file a motion to dismiss under Section 707(b)(2) has passed." *In re Arndt*, 2017 WL at **24.

707(b)(2)(B) provides the method and standard by which a debtor may rebut the presumption by demonstrating special circumstances. An opposing party who believes the bright-line test to unfairly favor an abusive debtor may seek to dismiss the case based on the "totality of the circumstances" or a showing that the petition was filed "in bad faith" pursuant to Section 707(b)(3).

Similarly, the Credit Union's reliance upon *Ransom v. FIA Card Servs., N.A.,* 562 U.S. 61 (2011), is misplaced. In *Ransom*, the Supreme Court held that the IRS Local Standard expense amount for transportation "Ownership Costs" covers only loan and lease payments and that a Chapter 13 debtor that "does not have any" because he owns a car free from any debt or obligation may not deduct the expense in calculating projected disposable income. 562 U.S. at 80. Although also a Chapter 13 case like *Lanning, Ransom* focused not on the term "projected" but instead on the term "applicable." Section 1325(b)(3) directs that for above-median debtors, the "reasonably necessary" expenditures to be deducted in determining disposable income "shall be determined in accordance with subparagraphs (A) and (B) of section 707(b)(2)." 11 U.S.C. § 1325(b)(3). Section 707(b)(2)(A)(ii) permits deduction of "the debtor's applicable monthly expense amounts specified under the National Standards and Local Standards … issued by the Internal Revenue Service." Based on the ordinary meaning of the term "applicable" as "having relevance" or "fit, suitable, or right to be applied: appropriate," the Court found that the Local Standard for transportation "Ownership Costs" was not "applicable" to a debtor who did not incur such costs. 562 U.S. at 69.

The Court generally stated that "[b]ecause Congress intended the means test to approximate the debtor's reasonable expenditures on essential items, a debtor should be required to qualify for a deduction by actually incurring an expense in the relevant category." 562 U.S. at 70. However, the Court took "consideration of BAPCPA's purpose" only to "strengthen our reading of the" plain language in the statute and the term "applicable." 562 U.S. at 70-71. The Court did not suggest that expenses should be limited to actual expenses where such interpretation is inconsistent with the terms of the statute. *See, e.g., Baker Botts L.L.P. v. ASARCO LLC,* 135 S. Ct. 2158, 2169 (2015) ("Our job is to follow the text even if doing so will supposedly undercut a basic objective of the statute."). To the contrary, the Court recognized that other portions of the means test permit deductions based on "actual" expenses and noted that the Court's interpretation "avoids conflating 'applicable' with 'actual' costs." 562 U.S. at 75. For example, the Court noted that under its reading, a debtor "may claim an allowance [based on National or Local Standards] only for the specified sum, rather than for his real expenditures" while for "the Other Necessary Expense categories ... the debtor may deduct his actual expenses, no matter how high they are." 562 U.S. at 75-76.

Unlike subsection (A)(ii) of Section 707(b)(2), subsection (A)(iii) makes no reference to "applicable" expenses or to IRS collection standards. Instead, it requires application of a mathematical formula based on the "total of all amounts scheduled as contractually due to secured creditors" during the 60 months following the date of the petition. The subsection does not require that the debtor intend to make any

payments during that period. Instead, it only requires that the creditor be a "secured creditor" and that amounts be "scheduled as contractually due" within the specified period.

Nor does the Seventh Circuit's decision in *In re Turner*, 574 F.3d 349 (7th Cir. 2009), support the Credit Union's argument. *Turner*, like *Ransom* and *Hamilton*, involved the issue of projected disposable income during the term of a Chapter 13 plan, and like those cases is limited to the Chapter 13 issue. The Court of Appeals held that where a Chapter 13 debtor intended to surrender his home to a secured creditor prior to confirmation of his plan, he could not deduct mortgage payments as a projected expense in calculating his projected disposable income. But the reasoning of the opinion makes clear its holding is specific to the issue of Chapter 13 plan confirmation. For example, the court contrasts issues of debtor eligibility within a specific chapter which should be "determined by the facts as they exist when a case is filed and is unaffected by a subsequent change in those facts." 574 F.3d at 355 (comparing to principles of jurisdiction). It distinguished eligibility at the outset of the case from the issue of Chapter 13 plan confirmation and projected disposable income, the latter requiring "balanc[ing] the need of the debtor to cover his living expenses against the interest of the unsecured creditors in recovering as much of what the debtor owes them as possible." 574 F.3d at 355. Additionally, the court questioned the applicability or relevance of Section 707(b)(2)(A)(iii)(I) – the provision at issue here – to its determination in *Turner*, stating that the debtor "ascribes significance to a provision relating the conversion of a Chapter 7 bankruptcy to a

Chapter 13 bankruptcy" before quickly dismissing the argument. 574 F.3d at 355.

## 2. Debtors' Indebtedness to the Credit Union Is Not a "Secured Debt" for Purposes of the Chapter 7 Means Test.

Section 707(b)(2)(A)(iii) permits the reduction of the "debtor's average monthly payments on account of secured debts" for purposes of the means test. This amount "shall be calculated as the sum of ... amounts scheduled as contractually due to secured creditors" during the 60 months after the petition date plus any "additional payments to secured creditors necessary for the debtor, in filing a plan under chapter 13" to maintain such property. 11 U.S.C. § 707(b)(2)(A)(iii). However, neither the term "secured debt" nor "secured creditor" is defined in the Bankruptcy Code. To be sure, Section 506(a) provides a "statutory definition" for the similar term "secured claim," one that restricts that term to the value of the underlying security. *Bank of Am., N.A. v. Caulkett*, 135 S. Ct. 1995, 1999 (2015). Section 506(a) states that an "allowed claim of a creditor secured by a lien on property in which the estate has an interest ... is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property ... and is an unsecured claim to the extent that the value of such creditor's interest ... is less than the amount of such allowed claim." 11 U.S.C. § 506(a).

Some courts have concluded that the term "secured debt" used in Section 707(b)(2)(A)(iii) is distinguishable from the term "secured claim" used in Section 506(a), with the former referring to any debt of the debtor individually and under nonbankruptcy law and the latter pertaining to a claim against the bankruptcy

estate. *See, e.g., In re DeLuna*, 2012 WL 4679170 (Bankr. W.D. Tex. Oct. 2, 2012).[12] On the other hand, the Bankruptcy Code defines the term "debt" by reference to the term "claim," stating that the "term 'debt' means liability on a claim." 11 U.S.C. § 101 (12).

This court, however, is bound by the Seventh Circuit's ruling in *In re Day* that the term "secured debt" as used in the Bankruptcy Code is modified by the bifurcation provisions of Section 506(a). 747 F.2d 405 (7th Cir. 1984). *Day* involved Section 109(e)'s debt limits for eligibility to be a Chapter 13 debtor. That provision also uses the term "secured debt," setting forth separate monetary caps for "noncontingent, liquidated, unsecured debts" and "noncontingent, liquidated secured debts" which the debtor "owes, on the date of the filing of the petition." 11 U.S.C. § 109(e). In *Day*, the debtor claimed a certain debt to be a "secured debt" because it was secured by certain accounts receivable. Finding the accounts receivable to be worthless, the Court of Appeals held that the debt should be treated as unsecured for purposes of eligibility under Section 109(e) by operation of Section 506(a). 747 F.2d at 406-07 (citing *In re Bobroff*, 32 B.R. 933 (Bankr. E.D. Pa. 1983); *In re Ballard*, 4 B.R. 271 (Bankr. E.D. Va. 1980); 3 COLLIER ON BANKRUPTCY ¶ 506.01, at 406–2 (15th ed. 1979) ("[T]he term 'secured claim' as used throughout the Code refers to a secured claim as determined under section 506.")).

The Seventh Circuit expressed concern that a contrary interpretation could result in "the absurd situation" where a prospective debtor could "easily circumvent"

---

[12] See also the distinction found in Section 506(a) between "[a]n allowed claim" and "a secured claim." 11 U.S.C. § 506(a).

Section 109(e)'s debt limit by creating a security interest in property with little or no value to secure a large unsecured debt shortly before the petition date. 747 F.2d at 407. The Chapter 7 means test under Section 707(b)(2) suffers from similar dangers of circumvention. Like Section 109(e)'s function limiting Chapter 13 eligibility, the Chapter 7 means test serves as a gateway through which the Chapter 7 must pass to be eligible for relief.[13] Additionally, interpreting "secured debt" in the same way in two provisions of the Bankruptcy Code better accords with general rules of statutory interpretation. The "normal rule of statutory construction [is] that identical words used in different parts of the same act are intended to have the same meaning." *Bank of Am., N.A. v. Caulkett*, 135 S. Ct. 1995, 1999 (2015) (quoting *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 101 (2003)).[14]

However, this Court's conclusion that the bifurcation feature of Section 506(a) applies to "secured debt" does not end the analysis. Section 707(b)(2)(A)(iii) is clear that the deduction for "payments on account of secured debts" shall be calculated based on required "payments to secured creditors." The evidence and stipulations show that while the Credit Union is not a "secured creditor" for purposes of Section 707(b)(2)(A)(iii), Shellpoint is. The parties have stipulated that the Credit Union's

---

[13] *See, e.g., McDow v. Dudley*, 662 F.3d 284, 289 (4th Cir. 2011) ("Section 707(b) creates a statutory gateway based on whether the case is abusive."); *Marrama v. Citizens Bank of Massachusetts*, 549 U.S. 365, 373–74 (2007) (describing a ruling that a case should be dismissed or converted because of prepetition bad-faith conduct as "tantamount to a ruling that the individual does not qualify as a debtor").

[14] In *Caulkett*, the Court found that despite the ordinary rule of statutory interpretation the same term "secured claim" had different meanings in Section 506(a) and 506(d) of the Bankruptcy Code. But the Court did so finding that its earlier ruling in *Dewsnup v. Timm*, 502 U.S. 410 (1992), on the meaning of the phrase "forecloses this textual analysis" and highlighted that the petitioner had not asked the Court to overrule *Dewsnup*. 135 S. Ct. at 1999.

mortgage is a "second" mortgage and that the Shellpoint holds a "first mortgage" in the residence securing a debt of over $1.3 million. While neither party contends that the Debtors' residence is worth more than $600,000, neither contend that the property is worthless. It cannot be disputed that after application of Section 506(a), the Credit Union's debt must be treated as a completely unsecured claim and that at least part of the claim of Shellpoint Mortgage Servicing remains secured. Because the calculation under Section 707(b)(2)(A)(iii) is based not on the total value of the debt, but on scheduled or required payments "to secured creditors," this court must conclude (first) that none of the Debtors' contractually scheduled payments to the Credit Union can be deducted and (second) that the Debtors' scheduled payments within the relevant timeframe to Shellpoint may be deducted under the means test, even if a portion of that debt is determined to be unsecured under Section 506(a).

This accords with the reasoning of *Nobelman v. Am. Sav. Bank,* where the Supreme Court held that a debtor could not modify the rights of such a mortgage holder through a Chapter 13 plan to bifurcate and "strip down" the mortgage to the value of the collateral.[15] 508 U.S. 324 (1993). The statutory provision examined in that case, like the provision at issue here, focuses not on a secured claim itself but rather on the rights of a creditor, or holder of a secured claim. Specifically, Section 1322(b)(2) prevents modification of "the rights of holders of secured claims [if the

---

[15] While under *Nobelman,* Section 1322(b)(2) prohibits a "strip down" of a partially underwater mortgage to the value of the security, "courts allow a Chapter 13 plan to eliminate a secured junior claim (such as a claim secured by a second mortgage) against residential property if the security interest no longer has value because what the debtors owe holders of liens senior to this creditor's lien (the holder of a first mortgage for example) exceeds the value of the property." *Palomar v. First Am. Bank,* 722 F.3d 992, 995 (7th Cir. 2013) (citing *In re Bartee,* 212 F.3d 277, 292–95 (5th Cir.2000); *In re McDonald,* 205 F.3d 606, 615 (3d Cir.2000)).

claim is] secured only by a security interest in real property that is the debtor's principal residence." 11 U.S.C. § 1322(b)(2). In *Nobelman*, the Court emphasized that the provision protects the "rights of holders" of secured claims, not the "secured claim" itself. 508 U.S. at 328. Since it was undisputed that, even accepting the debtor's lower valuation of the collateral, the bank was "still the 'holder' of a 'secured claim,'" the Court found that Section 1322(b)(2) prevented modification of its rights, including the mortgage. 508 U.S. at 328-29.

The Chapter 7 means test similarly permits deduction not of the value of a secured claim or a secured debt, but rather contractually scheduled payments "due to secured creditors" during the specified period and "additional payments to secured creditors" necessary under a Chapter 13 plan to maintain possession of collateral. 11 U.S.C. § 707(b)(2)(a)(iii). While Section 707(b)(2) does not use the identical term "holder of a secured claim," the term "creditor" is defined by the Bankruptcy Code to include an "entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor." 11 U.S.C. § 101 (10)(A). Despite the use of the term "has a claim" rather than "holder" of a claim, this court finds that the term "secured creditor" is sufficiently similar to the term "holder of a secured claim" that the reasoning in *Nobelman* is properly analogous and concludes that Section 707(b)(2)(a)(iii) includes scheduled payments to a partially undersecured secured creditor.

Indeed, it would be difficult to apply the calculations otherwise. How would "amounts scheduled as contractually due" to Shellpoint be allocated between the

'secured' and 'unsecured' portion of the debt for purposes of the calculation? It is especially clear here, where it appears that Shellpoint's mortgage is solely in property that is the debtor's principal residence, and therefore would be protected by Section 1322(b)(2) in a Chapter 13 proceeding. Because Section 707(b)(2)(A)(iii)(II) permits deduction of "additional payments to secured creditors necessary for the debtor, in filing a plan under chapter 13 of this title, to maintain possession of the debtor's primary residence"[16] and because *Nobelman* holds that Shellpoint's contract rights cannot be modified by a plan, the Debtors would presumably have to continue to make contractual payments to Shellpoint to maintain possession of their residence. The same is not true of the completely undersecured Consumers Credit Union. *See supra,* n. 6; *Palomar v. First Am. Bank,* 722 F.3d 992, 995 (7th Cir. 2013).

Therefore, the Debtors' Form 122A-2 Means Test analysis incorrectly deducts "average monthly payments" to the Credit Union of $4,015.00. When that error is corrected, the Debtors' monthly disposable income under the means test totals a negative $20 per month, slightly below the threshold for presumptive abuse.

### 3. Adjustment for the IRS Standard Expense Allowance.

Of the $6,622.00 in expenses "allowed under the IRS expense allowances" that the Debtors used in their means test calculation, three deductions were based on local, rather than national, standards. However, the Debtors have admitted that they used figures for Lake County rather than McHenry County, where their residence is

---

[16] Notably, while Section 707(b)(2)(A)(i)(III) requires "a debtor [to be] eligible for chapter 13" to deduct in the means test hypothetical administrative expenses and Chapter 13 trustee fees, Section 707(b)(2)(A)(iii)(II) sets forth no such eligibility test for deducting payments on property necessary for support.

located, in claiming these deductions. (Resp., ECF No. 28, ¶ 20.) In doing so they incorrectly claimed a deduction of $682 for their vehicle operation expenses for their two vehicles rather than the permitted $406, and claimed $572 for non-mortgage housing and utility expenses rather than the permitted $520. [17] If the Debtors had used the correct numbers based on McHenry County, they would have had a total of $328 less in monthly allowances. Together with the adjustment removing the Credit Union payments, this would result in positive monthly disposable income under the means test of $308 per month. Multiplied by 60, this amounts to $18,480, $5,630 above the $12,850 maximum established by Section 707(b)(2), thereby triggering the presumption of abuse.

## B. The Debtors Have Rebutted the Presumption.

Section 707(b)(2) further provides that "the presumption of abuse may only be rebutted by demonstrating special circumstances, such as a serious medical condition or a call or order to active duty in the Armed Forces, to the extent such special circumstances that justify additional expenses or adjustments of current monthly income for which there is no reasonable alternative." 11 U.S.C. § 707 (b)(2)(B)(i). The debtor must specifically "itemize each additional expense or adjustment of income" and provide and attest under oath as to the accuracy of "(I) documentation for such expense or adjustment to income; and (II) a detailed explanation of the special

---

[17] The third erroneous local expense deduction is of little impact since it was not used in the ultimate calculation. The Debtors claimed a $1,906.00 "mortgage or rent expense" based on local standards rather than the permitted $1,706. But where a debtor also claims a deduction for a mortgage payment as a payment on a secured debt, the form is structured to prohibit double-counting. Since under the court's holdings above, the Debtors are still entitled to deduct the $3,472 "average monthly payment" to Shellpoint Mortgage Servicing, and because this amount still exceeds the claimed IRS standard mortgage or rent expense, the IRS standard is not relevant to the calculation in this case.

circumstances that make such expenses or adjustment to income necessary and reasonable." 11 U.S.C. § 707(b)(2)(B)(ii), (iii). Such additional anticipated expenses or adjustments must be sufficient in amount to bring the disposable income otherwise determined according to the means test below the threshold to pass the test. 11 U.S.C. § 707(b)(2)(B)(iv).

The Debtors presented evidence largely through the testimony of Ms. Plichta of the expenses incurred in connection with her chronic medical condition. The movant did not challenge her testimony about her health and largely did not dispute her special needs. Ms. Plichta testified credibly about these needs, including the necessity for two certified service dogs. This court observed firsthand at trial the Debtor's dependence on the animal that accompanied her to the courtroom and the extent it calmed her and enabled her to testify. She testified that her smaller dog is an emotional support animal while the larger is a "duty dog" that retrieves objects she cannot pick up and helps her if she falls. The Debtors' Schedule J listed the monthly expense for the service dogs to be $300 each. Ms. Plichta testified credibly to the accuracy of this estimate, clarifying that the amount sometimes varied depending on whether they had a hospital visit during a given month. The Credit Union elicited no testimony and provided no evidence to suggest that such listed expenses were not accurate or to controvert the evidence that the dogs were necessary for Ms. Plichta's medical condition. Nor does the Credit Union dispute the monthly income listed in the Debtors' means test calculation or controvert their testimony that the other ordinary expenses included in their deductions are reasonable and

necessary.[18] The service dog expense was not included in the medical and insurance expenses used in the means test calculation.[19] When the means test is performed with the $600 incurred monthly for Ms. Plichta's service animals, the Debtors available income falls well below the threshold for the statutory presumption.

This is so even if, as the Credit Union urges, the Debtors' expenses should be limited to the standard amount for a household of two. In their means test calculation, the Debtors included their adult daughter, but they did not claim her as a dependent in their 2017 federal tax returns. Ms. Plichta testified without contravention that their adult daughter moved in with them shortly before the petition date and that the daughter depends entirely on her parents for support. She explained that she and her spouse did not and could not claim their daughter as a dependent in their 2017 federal tax returns because she had lived with them less than the requisite six months for tax year 2017. Ms. Plichta testified credibly that their daughter has serious health issues, lost her job and on August 30 or September 1, 2017, and moved back in with the Debtors.

Courts have disagreed on the appropriate method for determining the number of people within a family or household for purposes of Section 707(b)(2). The statute allows the deduction for "the debtor's applicable monthly expense amounts specified

---

[18] Excepting the Credit Union's argument regarding the deductions for payments on secured debts which is discussed above.

[19] Specifically, the $1,300 the Debtors listed as estimated "Medical and dental expenses" in their Schedule J matches the total of $147 in out-of-pocket health care allowance and $1,153 in additional health care expenses listed in their means test calculation. The $312 for health insurance in their means test calculation also matches the $312 payroll deduction for insurance listed in their Schedule I.

under the National and Local Standards ... issued by the Internal Revenue Service" for "the debtor, the dependents of the debtor, and the spouse of the debtor in a joint case, if the spouse is not otherwise a dependent." 11 U.S.C. §707(b)(2)(A)(ii)(I). The National and Local Standards at issue here do not use the term "dependent."[20] *See Means Testing, Census Bureau, IRS Data and Administrative Expenses Multipliers (Cases Filed Between May 1, 2017 and October 31, 2017, Inclusive),* https://www.justice.gov/ust/means-testing/20170501 (last visited Sept. 4, 2018).

The term "dependent" is not defined by the Bankruptcy Code. Courts disagree as to the meaning of the term for purposes of Section 707(b)(2)(A)(ii) and whether it applies to only individuals whom the debtor can claim as a dependent for tax exemption purposes. *Compare, e.g., In re O'Connor*, No. 08-60641-13, 2008 WL 4516374, at *11 (Bankr. D. Mont. Sept. 30, 2008) (debtors were not able to include for expense calculation adult nephew whom they had not claimed as a dependent in their tax returns) *with In re Robinson*, 449 B.R. 473, 480 (Bankr. E.D. Va. 2011) (adopting broader "economic unit approach"). They also disagree as to whether the reference to "dependents" in Section 707(b)(2)(A)(ii) is more restrictive than the IRS National and Local Standards. *Compare, e.g., In re Bridgeforth*, 556 B.R. 121, 124 (Bankr. M.D. Pa. 2016) (National and Local Standards permitted debtor to include nonfiling spouse within "family" even spouse was not a "dependent" under Section 707(b)(2)(A)(ii)) *with In re Law*, No. 07-40863, 2008 WL 1867971 (Bankr. D. Kan. Apr. 24, 2008)

---

[20] Each of the IRS standards consist of basic tables. The out-of-pocket health care expense claimed by the Debtors consists of one amount for under 65 and a higher amount for 65 and older. The IRS National Standard for food and clothing has separate columns for "one person, two persons, three persons, four persons." The Illinois Local Standard for housing and utilities expense has columns for "a family of 1, for a family of 2, for a family of 3, for a family of 4, for a family of 5." *Id.*

(debtor may not claim non-dependent adult son despite National Standards).

Nor are the National and Local Standards clear as to how the relevant "family size" or number of "persons" is to be determined. The IRS states in the Internal Revenue Manual that:

> Generally, the total number of persons allowed for national standard expenses should be the same as those allowed as exemptions on the taxpayer's current year income tax return. Verify that exemptions claimed on the taxpayer's income tax return meet the dependency requirements of the IRC. There may be reasonable exceptions. Fully document the reasons for any exceptions. For example, foster children or children for whom adoption is pending.

Internal Revenue Manual § 5.15.1.7 (Oct. 2, 2012).   With respect to the Local Standards, the manual similarly states that "[g]enerally the total number of persons allowed for determining family size should be the same as those allowed as exemptions on the taxpayer's most recent year tax return. There may be reasonable exceptions, such as foster children or children for whom adoption is pending." Internal Revenue Manual § 5.15.1.9 (Nov. 17, 2014).  This suggests that the number of "persons" or "family size" is tied to the number of qualified exemptions, though the manual also permits "reasonable exceptions."  The manual gives little guidance on what constitutes a "reasonable exception" other than foster children or pending adoptions.

The Supreme Court has suggested that while the Internal Revenue Manual, as well as the IRS's Collection Financial Standards – "the IRS's explanatory guidelines to the National and Local Standards" – may be helpful in interpreting the standards, they are not determinative. *Ransom v. FIA Card Servs., N.A.*, 562 U.S. 61,

(2011). In *Ransom*, the Supreme Court found that the Internal Revenue Manual and IRS Collection Financial Standards supported its finding that the transportation ownership expense in the National Standards was not "applicable" to a Chapter 13 debtor who will not incur loan or lease payments during his bankruptcy plan. 562 U.S. at 72. However, to "be clear on this point, [the Court] emphasize[d] that the statute does not 'incorporat[e]' or otherwise 'impor[t]' the IRS's guidance" but simply noted that the agency that created, revises and uses the National and Local Standards may "have something insightful and persuasive (albeit not controlling) to say about them." 562 U.S. at 73 n.7.

This court need not resolve here these conflicts in authority or determine whether the Debtors properly claimed a family of three for purposes of the National and Local Standards expenses, however, because the difference in amount will not change the outcome.[21] Had they claimed a family of two, and excluded their daughter, their standard expense for food and clothing would have been $1,132 instead of $1,378. Their standard expense for non-mortgage local housing and utilities would

---

[21] For the same reason, the court need not determine whether the Debtors' situation involves a "reasonable exception," as such term is used in the Internal Revenue Manual, warranting including the Debtors' daughter within their family size. Nor need the court determine whether the Debtors are entitled to any additional expenses with respect to the daughter under Section 707(b)(2)(A)(ii)(II). That subsection allows an additional expense for "the continuation of actual expenses paid by the debtor that are reasonable and necessary for care and support of an elderly, chronically ill, or disabled household member or member of the debtor's immediate family (including parents, grandparents, siblings, children, and grandchildren of the debtor, the dependents of the debtor, and the spouse of the debtor in a joint case who is not a dependent) and who is unable to pay for such reasonable and necessary expenses." 11 U.S.C. § 707(b)(2)(A)(ii)(II). There was little evidence presented at trial as to the nature of the daughter's medical condition and financial situation or as to what actual expenses the Debtors had paid and expected to pay for the care and support of the daughter.

have been $493 instead of $520.[22]  Their standard expense for out of pocket health

care expenses would have been $98 instead of $147.  These adjustments would have

resulted in additional disposable income of $322.  The Debtors' uncontroverted

evidence of their necessary service animal expense more than offsets any upward

income adjustment attributed to household size were the tax deductibility standard

found to apply.

### C. Dismissal Based on Bad Faith or the Totality of the Circumstances Under Section 707(b)(3).

In the alternative, the Credit Union asks this court to find that the Chapter 7

petition was filed in bad faith.  Section 707(b)(3) provides that:

> In considering under paragraph (1) whether the granting of relief would be an
> abuse of the provisions of this chapter in a case in which the presumption in
> paragraph (2)(A)(i) does not arise or is rebutted, the court shall consider—
>
>> (A) whether the debtor filed the petition in bad faith; or
>> (B) the totality of the circumstances (including whether the debtor seeks to
>> reject a personal services contract and the financial need for such rejection
>> as sought by the debtor) of the debtor's financial situation demonstrates
>> abuse.

11 U.S.C. § 707(b)(3).  The Credit Union "bears the burden under section 707(b)(3) of

demonstrating that the totality of the circumstances indicates abuse." *In re Smith*,

2016 WL 7441605, at *4 (Bankr. N.D. Ill. Dec. 27, 2016) (citing *In re Johnson*, 503

B.R. 447, 451 (Bankr. N.D. Ind. 2013); *In re Grinkmeyer*, 456 B.R. 385, 389 (Bankr.

N.D. Ind. 2011)).

The Seventh Circuit has not defined the phrase "totality of the circumstances"

---

[22] Their mortgage housing and utilities expenses would have totaled $1,619 instead of $1,706.  But, as
noted above, because they already claimed a higher amount as a secured debt payment expense, the
standard expense did not factor into their means test calculation.

for purposes of Section 707(b)(3). *In re Smith*, 2016 WL 7441605, at *3 (Bankr. N.D.

Ill. Dec. 27, 2016).   Courts have "suggest[ed] that the test requires a subjective,

holistic assessment of the debtor and his circumstances." *Id.* (citing *In re Watts*, 557

B.R. 640, 646 (Bankr. N.D. Ill. 2016); *In re Kruse*, 545 B.R. 581, 589 (Bankr. W.D.

Wis. 2016); *In re Bacardi*, 2010 WL 54760, at *3 (Bankr. N.D. Ill. Jan. 6, 2010)).   This

"analysis is fact-intensive and performed on a case-by-case basis," *id.,* but the Seventh

Circuit has indicated reluctance over crafting a bright-line, one-size-fits-all approach.

Discussing the standard for dismissal of a Chapter 13 case for bad faith, the Court

stated:

> In evaluating good faith necessary for the confirmation of a Chapter 13
> plan, this court has refused to adopt a specific test or definition of good
> faith. Instead, this court has held that good faith is a term incapable of
> precise definition, and, therefore, the good faith inquiry is a fact
> intensive determination better left to the discretion of the bankruptcy
> court. As such, we have directed the bankruptcy courts to look at the
> totality of circumstances and, thereby, make good faith determinations
> on a case-by-case basis.   The good faith determination with regard to the
> filing of a Chapter 13 petition is also a fact intensive inquiry to be
> determined by looking at the totality of circumstances.

*In re Love*, 957 F.2d 1350, 1355 (7th Cir. 1992) (internal citations omitted).

"[A] debtor's ability to pay" his debts "may be the most relevant factor" in

determining whether a Chapter 7 petition was filed in bad faith or whether the

totality of circumstances demonstrate abuse for purposes of Section 707(b)(3). *In re

Deutscher*, 419 B.R. 42, 45 (Bankr. N.D. Ill. 2009) (citing *In re Cutler*, 2009 WL

2044378, at *3 (Bankr. S.D. Ind. July 9, 2009); *In re Green*, 934 F.2d 568, 572 (4th

Cir.1991)). Other factors may include: "(1) whether the bankruptcy petition was filed

because of sudden illness, calamity, disability or unemployment; (2) whether the

debtor incurred cash advances and made consumer purchases far in excess of his ability to pay; (3) whether the debtor's proposed family budget is excessive or unreasonable; and (4) whether the debtor's schedules and statement of current income and expenses reasonably and accurately reflect the true financial condition." *In re Deutscher*, 419 B.R. at 45. [23]

More recently, the Seventh Circuit described the main criteria under Section 707(b) as "whether the debtors' income is high enough to enable them to repay a significant amount of debt without sacrificing a reasonable standard of living." *In re Schwartz*, 799 F.3d 760, 762-63 (7th Cir. 2015).[24] Largely for procedural reasons, *Schwartz* involved the issue of "cause" to dismiss under Section 707(a) rather than "bad faith" or "totality of the circumstances" under Section 707(b)(3). The Court found that an "unjustified refusal to pay one's debts" despite the ability to do so "without hardship" constituted "cause" for dismissal under Section 707(a). 799 F.3d at 763-64.

---

[23] At least with respect to cases filed prior to the 2005 amendments to the Bankruptcy Code, the Seventh Circuit had identified the following factors in determining whether a *Chapter 13* petition has been filed in bad faith: "(a) the nondischargeability of the debt; (b) the time of the filing of the petition; (c) how the debt arose; (d) the debtor's motive for filing the petition; (e) how the debtor's actions affected creditors; (f) the debtor's treatment of creditors both before and after the petition was filed; and (g) whether the debtor has been forthcoming with the bankruptcy court and the creditors." *In re Sidebottom*, 430 F.3d 893, 899 (7th Cir. 2005) (citing *In re Love*, 957 F.2d 1350, 1357 (7th Cir. 1992)). Some of these factors might be relevant to dismissal under Section 707(b)(3), as well. However, in addition to the issue of whether a petition is abusive, Section 707(b)(3) considers whether the filing of a Chapter 7 petition (as opposed to a Chapter 13 or 11 petition) is an abuse. "Congress adopted the means test—[t]he heart of [BAPCPA's] consumer bankruptcy reforms ... to help ensure that debtors who can pay creditors do pay them." *Ransom v. FIA Card Servs., N.A.*, 562 U.S. 61, 64 (2011) (internal citation and quotation marks omitted). If "a debtor has enough disposable income to pay his unsecured creditors at least [the threshold amount under the means test] the debtor usually should proceed under Chapter 13, which allows for a partial repayment of debt" rather than under Chapter 7. *In re Ross-Tousey*, 549 F.3d 1148, 1151 (7th Cir. 2008), *abrogated by Ransom v. FIA Card Servs., N.A.*, 562 U.S. 61 (2011).

[24] The other two criteria listed by the Seventh Circuit, "whether the debts are mainly consumer debts" and whether the debtor's "income is at least as high as the median family income in their region," are not disputed here. 799 F.3d at 762-63.

The court found that the debtors' expenditures "on inessential consumer goods and services, including tickets to Disney World" as well as other "optional consumer expenditures" including "private-school tuition for their children and a monthly payment of $850 for a Range Rover" and expenditures on legal fees contesting creditor collection efforts rather than debt repayment was "optional rather than essential" consumption. 799 F.3d at 761-63.

For its bad faith argument, the Credit Union begins by pointing to the claims registry which indicate that the mortgage loans of the Credit Union and Shellpoint make up more than 99% of the total claims filed in this bankruptcy.[25] But the Credit Union documents filed with its proof of claim also indicate that its loan originated in January of 2008 and that it reduced the debt to judgment in November 2016. The proof of claim filed by Shellpoint indicates its debt to be even older. In stark contrast to *Deutscher*, this is not a case where the debtor racked up significant debt – either secured or unsecured – shortly before filing a bankruptcy petition. *See also Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 244 (2010) (noting the danger of abuse by debtors who may incur "additional debt prior to filing, as payments on secured debts offset a debtor's monthly income under the [means test] formula").

Nor has the Credit Union demonstrated that the Debtors were not forthcoming or made intentionally false statements in their bankruptcy schedules. The mistaken use of the Lake County standard for the means test was readily acknowledged by the Debtors. The Credit Union does not contend that the Debtors have additional income

---

[25] The only other claim filed in the case is a proof of claim by Navient PC Trust for $7,089.50.

or that they will not actually incur the expenses listed in their Schedule J.[26]

Nor has the Credit Union contended that any of the expenses claimed by the Debtors – other than the mortgage payment and certain other payments related to their home – are unnecessary or should be considered luxury expenditures. It contends instead that it is unreasonable for the Debtors to "choos[e] to stay living in [a] home that costs $800 per month for electricity and heating, $200.00 per month for repairs, and a mortgage of over $1.5 million for a property only worth $600,000.00 rather than repay their creditors." (ECF No. 30.) In addition, the Credit Union argues that it was abuse for the "Debtors [to spend] $40,000.00 in three months in 2017 for mortgage payments (to Shellpoint Mortgage), home repairs, and mold remediation" pre-petition instead of making any payments to it. (*Id.*)

But the Credit Union fails to meet its burden of demonstrating that the Debtors' prepetition conduct or the petition itself constitute abuse warranting dismissal. Ms. Plichta testified credibly about the condition and furnishings of their home and the repairs performed, and supplemented this testimony with photographs showing the condition of the home. The movant does not challenge her testimony that the last significant purchases for their home are a couch purchased in 2003 and a 2004 television set. Nor did it controvert her testimony that the remediation of the mold damage and expenditures for the humidification system addressing her breathing difficulties were necessary for the Debtors' health and to maintain the

---

[26] The Credit Union contends that the Debtors have not and will not make the payments to the Credit Union listed in the means test calculation, but that expense is not listed in their Schedule J and, as discussed above, the means test calculation by its nature is not a projection of actual income and expenses.

integrity of the home. Nor do the photographs of the home presented at trial suggest that the Debtors had made luxury improvements to their home.

The Motion points to the current balances of the mortgages and the current value of the home to argue that "the Debtors incurred consumer debts far in excess of their ability to pay." (ECF No. 18, ¶ 29.) But the Credit Union provided no evidence as to the original value of the home, the Debtors' financial condition at the time the loans were incurred or the payment history of the mortgage debts to show that it was unreasonable at the time for the Debtors to incur the debts. As noted above, the mortgage loans are not recent, and the Credit Union provided no evidence to show they were incurred in anticipation of bankruptcy.

The Credit Union seems to argue that it would not be a "hardship," as the court phrased it in *In re Schwartz*, for the Debtors to find less expensive housing, particularly if their current home is worth significantly less than the debt encumbering it. The Credit Union failed to offer any proof that less expensive suitable alternate housing is available. The court cannot speculate on what alternatives are available to these Debtors, particularly given their testimony regarding their medical conditions. Ms. Plichta testified as to numerous severe medical conditions afflicting her and the other members of her family. She also testified without contravention that the Debtors had spent approximately $20,000 in 2003 to install specialized ductwork in their home because of one of her health conditions.

Additionally, the court is cautious about dismissing a case under Section

707(b)(3) solely because a debtor has a high amount of secured debt. The court in *Deutscher* noted that courts should be "attentive to the policy choices made by Congress in drafting the means test, including the fact that it gave preferred treatment to secured creditors by allowing scheduled payments of secured debt to be listed as deductions without limitation." 419 B.R. at 45 (citing *In re Le Roy*, 2009 WL 357923, at *3 (Bankr. E.D. Wis. Feb. 12, 2009). As noted above, there is no indication that the debts here were incurred in contemplation of bankruptcy or to manipulate the means test. Nor has the Credit Union shown the Debtors' residence to constitute a "luxury" or unnecessary expenditure such that it would not constitute a hardship for the Debtors to lose their home.

Finally, the Credit Union has not shown that creditors would receive more in a Chapter 13 or Chapter 11 bankruptcy. The final report of the Chapter 7 Trustee states that the bankruptcy estate has recovered $23,028, largely from his settlement with the Debtors. (ECF No. 54.) The Trustee stated at a hearing on the Motion that he opposes dismissal or conversion of the Debtors' case, which, in his opinion, would likely result in a return of some or all of that money to the Debtors.

This court tends to agree. To the extent the means test calculation approximates the projected disposable income that would be available to creditors in a Chapter 13 or Chapter 11 reorganization, the Debtors' calculation shows less than $22,000 available even after the corrections and adjustments discussed above. The Credit Union has not shown the likelihood that the Debtors, a couple of advanced years whose income is largely limited to retirement funds and the "social safety net,"

in coming years will have available disposable income sufficient to pay creditors more through a Chapter 13 or 11 plan than they would receive through liquidation. Indeed, the Credit Union is likely better off through a Chapter 7 liquidation since it at least would retain its junior mortgage. *See, e.g., Bank of America v. Caulkett*, 135 S. Ct. 1995 (2015) (a "wholly underwater" mortgage may not be "stripped off" by means of Section 506(d) in Chapter 7, even if the creditor "would receive nothing if the properties were sold today"). Though the mortgage right may be of little economic value today, that may well change if the Debtors' equity in their residence increases in the future.[27]

Accordingly, the Movant has failed to demonstrate that the Debtors' Chapter 7 petition was filed in bad faith or establish that the totality of the circumstances with respect to the Debtors' financial condition demonstrates abuse.

---

[27] *See Dewsnup v. Timm*, 502 U.S. 410, 417 (1992) ("Any increase over the judicially determined valuation during bankruptcy rightly accrues to the benefit of the creditor, not to the benefit of the debtor and not to the benefit of other unsecured creditors whose claims have been allowed and who had nothing to do with the mortgagor-mortgagee bargain.") Additionally, the mortgage interest may give certain rights, such as the right to initiate or participate in a foreclosure proceeding, under state law. *See, e.g., Nobelman v. Am. Sav. Bank*, 508 U.S. 324, 329, (1993) (rights of lienholder normally includes "right to proceed against ... residence by foreclosure and public sale").

## CONCLUSION

The Motion will therefore be DENIED.  A separate order shall be entered giving effect to the determinations reached herein.

DATE:  September 5, 2018

ENTER:

_____
Thomas M. Lynch
United States Bankruptcy Judge